UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ORECK DIRECT, LLC                          CIVIL ACTION

VERSUS                                     NO: 07-2744

DYSON, INC.                                SECTION: R(4)


**<u>ORDER AND REASONS</u>**[1]

Before the Court is defendant Dyson, Inc.'s motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Because matters outside the pleadings have been presented to and not excluded by the Court, the Court considers Dyson's motion as a Rule 56 motion for summary judgment. *See* Fed. R. Civ. P. 12(b)(6). For the following reasons, the Court GRANTS Dyson's motion.

---

[1] The Court issued an order granting defendant's motion on February 21, 2008. The Court VACATES that order and issues this revised order in its place.

I.    **BACKGROUND**

Plaintiff Oreck Direct, LLC has brought a false advertising claim against defendant Dyson, Inc. under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), and the Louisiana Unfair Trade Practices Act (LUTPA), La. Rev. Stat. 51:1405. Oreck and Dyson are competitors in the vacuum cleaner industry. Each sells a range of vacuum cleaners for use by individual consumers. Oreck manufactures and sells upright vacuums that utilize internal disposable bags to catch dust and dirt. Oreck primarily sells its products directly to consumers through its own "Oreck Clean Home Center" retail stores, but it also sells vacuum cleaners through familiar nationwide retailers such as Bed Bath & Beyond and JC Penney[2] and the home-shopping television network, QVC.[3] Dyson

_____

[2] *See* Dyson's Mem. Supp. Ex. C-C, Dep. Steven W. Hanson Dec. 13, 2006 at 23-24. The Court also takes judicial notice that a wide range of Oreck vacuum cleaners are advertised for sale on the JC Penney website. *See* JC Penney: Housewares: Cleaning & Care: Vacuums: Oreck, http://www4.jcpenney.com/jcp/ProductList.aspx?deptid=25439&pcatid=25867&catid=27166&cattyp=DEP&dep=Housewares&pcat=Vacuums&cat=Oreck&refpagename=WindowSolutionHOM%252Easpx&refdeptid=25439&refcatid=25867&cmAMS_T=H9&cmAMS_C=C6&CmCatId=25439|25859 (last visited Jan. 25, 2008). Dyson vacuum cleaners are also advertised on the JC Penney website. *See* JC Penney: Housewares: Cleaning & Care: Vacuums: Dyson, http://www4.jcpenney.com/jcp/ProductList.aspx?deptid=25439&pcatid=25867&catid=40250&cattyp=DEP&dep=Housewares&pcat=Vacuums&cat=Dyson&refpagename=WindowSolutionHOM%252Easpx&refdeptid=25439&refcatid=25867&cmAMS_T=H9&cmAMS_C=C7&CmCatId=25439|25859|25867 (last visited Jan. 25, 2008).
[3] *See* Dyson's Mem. Supp. Ex. D-E, Oreck's Responses to Dyson's First Set of Interrogatories at 6.

2

does not operate its own retail stores but instead sells its
vacuums to consumers through housewares and department stores,
such as Sear's, Target, Bed Bath & Beyond, Circuit City, and JC
Penney.[4] Dyson is affiliated with a British corporation, also
named Dyson after the company's founder, James Dyson. Dyson
typically develops and markets its products first in the United
Kingdom and then introduces them to the United States.[5] In the
United States, Dyson first promotes its vacuums to retailers, and
after retailers have agreed to carry Dyson's products, Dyson then
advertises its vacuum cleaners to the public at large.

　　　Oreck alleges that Dyson has made false representations
about the qualities of its "DC18" model vacuum cleaner in its
advertising and promotion of that vacuum. The DC18 is a bagless
vacuum cleaner that weighs approximately 15 pounds. Specifically,
Oreck contends that Dyson's various advertising claims that the
DC18 "does not lose suction" and that it is the "most powerful
lightweight" vacuum cleaner are false.[6] Oreck asserts that the
vacuum does indeed lose suction during the course of normal
operation and that it clogs like many other vacuum cleaners.
Oreck further asserts that the DC18 is not the most powerful

---

[4] *See* Response of Oreck Direct, LLC to Material Facts
Proposed by Dyson, Inc. at 3.
   [5] *See* Dyson's Mem. Supp. Ex. F, Decl. of Gordon Thom, June
7, 2007 at ¶ 5.
   [6] *See* Pl.'s Cmplt. at ¶ 7, R. Doc. 1 at 3.

lightweight vacuum cleaner. Oreck contends that these representations deceive consumers and have likely influenced consumers' purchasing choices to Oreck's detriment.

This is not the first time that Oreck has brought an action for false advertising and unfair trade practices against Dyson for Dyson's "no loss of suction" advertising. Oreck filed this suit only four months after it settled an earlier suit involving false advertising claims on Dyson's no loss of suction ad campaign. On February 10, 2005, Oreck sued Dyson under § 43(a) of the Lanham Act and under LUTPA, alleging that Dyson's advertising claims that its vacuum cleaners did not lose suction were false and misleading.[7] Oreck ultimately settled its false advertising claims against Dyson in that earlier action and agreed to dismiss its claims with prejudice in a settlement agreement that was effective as of January 5, 2007. The Court granted a joint motion to dismiss the first action with prejudice on January 10, 2007.[8]

Dyson now moves to dismiss Oreck's complaint on three separate grounds. First, it argues that the doctrine of *res judicata* precludes Oreck from bringing this action because Oreck already settled its claims against Dyson's no loss of suction

---

[7] *See* Pl.'s Cmplt. Civ. A. No. 05-0361 (Pl.'s First Cmplt.), R. Doc. 1.

[8] *See* Order of Dismissal with Prejudice Civ. A. No. 05-0361, R. Doc. 148.

advertising in the earlier litigation and agreed to dismiss those claims with prejudice. Second, Dyson argues that the settlement agreement executed in the first case shields it from liability for any false advertising claims with respect to the DC18. Third, Dyson argues that its advertising claims about the DC18 are non-actionable puffery. Because the Court concludes that the doctrine of *re judicata* bars Oreck's claims, the Court does not address Dyson's other arguments. Before analyzing the preclusive effect of the judgment in the earlier matter, however, a review of the earlier litigation and the advertising and promotion of the DC18 is necessary.

### A.   The First Lawsuit

In the first action, Oreck sought an injunction against Dyson to bar Dyson from "broadly" claiming that its vacuum cleaners "do not lose suction," as well as damages attributable to Dyson's "no loss of suction" advertising and promotion.[9] These representations, Oreck alleged, were false and misleading. Oreck attacked Dyson's general "no loss of suction" claims about its vacuum cleaners.[10] Oreck did not limit its false advertising claims to representations about specific Dyson vacuum cleaner models or specific modes of advertising or promotion. Through the

---

[9] *See* Pl.'s First Cmplt. at ¶¶ 16-17, Civ. A. No. 05-0361 R. Doc. 1 at 4.

[10] *See id.* at ¶ 1, Civ. A. No. 05-0361 R. Doc. 1 at 4.

course of discovery in the first litigation, Oreck included ads

on multiple Dyson vacuum cleaner models in its false advertising

and unfair trade practices claims. Thus, Oreck did not confine

its claims to the models being marketed as of the filing date of

its complaint. Instead, as Oreck became aware of Dyson's

marketing strategy and tactics for certain models, it sought and

obtained discovery on advertising and sales data for those

models. For instance, Oreck contends that when it brought the

first action, it was primarily concerned with Dyson's

advertisements for its "DC07" and "DC14" vacuum cleaner models.[11]

But when Dyson began to advertise its "DC15" model with similar

"no loss of suction" claims during the course of the first

action, Oreck requested and obtained discovery about that vacuum

cleaner.[12] Oreck's product testers also confirmed in deposition

testimony that Oreck's challenge to Dyson's no loss of suction

advertising concerned Dyson vacuum cleaners generally, and not

one vacuum in particular.[13]

The first case lasted nearly two years, and Dyson produced a

substantial number of documents about its vacuum cleaners in

response to Oreck's discovery requests. In response to Dyson's

interrogatories, Oreck stated that it "views as false and

---

[11] *See* Decl. of Bruce J. Oreck July 10, 2007 at ¶ 4.
[12] *See id.* at ¶ 5.
[13] *See* Dep. of Paul Moshenrose Nov. 10, 2006 at 193-94.

misleading all Dyson ads which state expressly or reasonably imply that Dyson upright vacuum cleaners 'never' lose suction."[14]

Oreck settled its claims against Dyson for a confidential amount.[15] The settlement agreement contained a "Release and Covenant Not to Sue" provision in which Oreck released Dyson "from all advertising . . . claims arising out of, and related to, the claims in the [earlier] Action" and agreed to dismiss its claims with prejudice.[16] Oreck further agreed that Dyson would be allowed to use advertising claims that it was making about any product "existing in the United States marketplace" as of January 5, 2007, the effective date of the settlement, without incurring any further liability to Oreck.[17] Upon being advised by the parties that they had settled their dispute, this Court granted the parties' joint motion to dismiss with prejudice on January 10, 2007.

---

[14] *See* Dyson's Mem. Supp. Ex. D-E, Oreck's Responses to Dyson's First Set of Interrogatories at 3.

[15] *See* Dyson's Mem. Supp. Ex. E-A, Settlement Agreement and Mutual Release: Oreck and Dyson Binding Settlement Term Sheet at ¶ 4.

[16] Dyson's Mem. Supp. Ex. E-A, Settlement Agreement and Mutual Release at ¶¶ 3, 4;  Settlement and Mutual Release: Oreck and Dyson Binding Settlement Term Sheet at ¶¶ 2, 3.

[17] Dyson's Mem. Supp. Ex. E-A, Settlement Agreement and Mutual Release: Oreck and Dyson Binding Settlement Term Sheet at ¶ 1(a).

**B.   Dyson's Advertising and Promotion of the DC18 Vacuum Cleaner**

The Dyson DC18 vacuum cleaner is marketed as a relatively lightweight vacuum cleaner with a slimmer profile and stronger suction power than other relatively small upright vacuum cleaners. During the DC18's development and testing stages, Dyson referred to it as the "N70." Internal Dyson documents produced to Oreck during discovery in the first action indicated that Dyson began testing and reviewing the N70 for introduction into the United States as early as July 2005[18] and that it tested the N70 in "home trials" from August 2005 through February 2006.[19] Other discovery documents also reflected that on January 25, 2006, Dyson presented the N70 to the retail giant Costco as a lightweight, high-performance vacuum cleaner.[20] Dyson also produced multiple documents revealing its plan to market the N70 in the United States.[21] Despite Oreck's having received numerous documents about the N70, it did not seek further discovery with respect to that vacuum.

As early as September 8, 2006, Dyson began to promote the

---

[18] *See* Dyson's Mem. Supp. Ex. E-C, Board Meeting Materials for Dyson, Ltd. June 20, 2005. Dyson produced discovery documents about the N70 on October 31, 2006.

[19] *See id.*, Board Meeting Materials for Dyson, Ltd. Aug. 15, 2005; Board Meeting Materials for Dyson Ltd., Feb. 20, 2006.

[20] *See id.* Ex. E-F, Presentation to Costco Jan. 25, 2006.

[21] *See id.* Ex. E-H, New Product Launch Presentations.

DC18 to nationwide retailers through company-to-company presentations, in which Dyson claimed that the DC18 is the "most powerful lightweight" and that it "doesn't lose suction."[22] As a result of Dyson's sales pitches, on November 29, 2006, Target agreed to purchase a significant number of units of the DC18.[23] In addition, in late November and early December 2006, after Dyson had promoted the DC18 to retailers, Sear's, Bed Bath & Beyond, and Circuit City, each retailer forecast that it would purchase thousands of units of the DC18.[24] In late December 2006, Dyson received 840 units of the DC18 in the United States from its manufacturing facility in Malaysia.[25] Also in December 2006, Dyson distributed 100 units of the DC18 to individuals in the United States in packaging bearing the disputed "no loss of suction" and "most powerful lightweight" claims to obtain user feedback under actual operating conditions.[26] After Dyson completed its marketing campaign to retailers, the DC18 became available for individual consumer purchase in February and March

---

[22] *See* Dyson's Mem. Supp. Exs. F-D – F-F, Linens 'n Things Presentation, Oct. 4, 2006; Sears Presentation, Sept. 8, 2006; Bed Bath & Beyond Presentation, Oct. 17, 2006; Target Presentation, Nov. 27, 28, 2006.

[23] *See* Dyson's Mem. Supp. Ex. F-I, Target – Dyson Sales Invoice, Nov. 29, 2006.

[24] *See* Dyson's Mem. Supp. Ex. F-H.

[25] *See* Dyson's Mem. Supp. Ex. F-J, United States Customs Import Receipt, Dec. 21, 2006.

[26] *See* Dyson's Mem. Supp. Ex. F, Decl. of Gordon Thom, June 7, 2007; Ex. F-K, Promotional Ltr., Dec. 29, 2006.

2007. Dyson then began to advertise the DC18 to the general public with the "no loss of suction" claims that it had used to promote earlier vacuum cleaner models.

On May 1, 2007, Oreck sued Dyson on its "no loss of suction" and "most powerful lightweight" claims specifically with respect to the DC18 model under the Lanham Act and LUTPA. Similar to the relief it sought in the first lawsuit, Oreck seeks an injunction barring Dyson from making these claims, as well as damages for lost profits. Dyson concedes that the DC18 was not available for retail sale to individual consumers at the time it executed the settlement agreement in the first case. Nevertheless, it maintains that the doctrine of *res judicata* bars Oreck's second suit because Dyson had extensively marketed the DC18 to numerous national retailers while the first case was pending and used the same "no loss of suction" advertising claims that were the subject of the first case. Further, Dyson argues that it produced documents about this marketing campaign through the course of discovery in the first action that put Oreck on notice about the existence of the DC18. Thus, Dyson argues, because Oreck brought general false advertising claims against Dyson and did not specify particular vacuum cleaners in its first complaint, Oreck could have brought any claims it might have had with respect to the DC18 in the first action, just as it did with other vacuum

cleaner models that it learned about during the course of discovery.

## II.   LEGAL STANDARDS

### A.   Summary Judgment

Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, "that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Lavespere v. Niagra Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). The moving party bears the burden of establishing that there are no genuine issues of material fact.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325; *see also Lavespere*, 910 F.2d at 178. The burden then shifts

to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See Celotex*, 477 U.S. at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue exists for trial. *See id.* at 325; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1996).

**B.  Res Judicata**

The federal law of *res judicata* applies to federal judgments. *See In re Ark-La-Tex Timber Co.*, 482 F.3d 319, 330 n.12 (5th Cir. 2007) (citing *Semtek Int'l v. Lockhead Martin Corp.*, 531 U.S. 497 (2001)). The doctrine of *res judicata* "relieve[s] parties of the cost and vexation of multiple lawsuits, conserve[s] judicial resources, and, by preventing inconsistent decisions, encourage[s] reliance on adjudication." *Allen v. McCurry*, 449 U.S. 90, 94 (1980). The party asserting the defense of *res judicata* must meet four elements: "(1) the parties in both the prior suit and the current suit must be identical; (2) a court of competent jurisdiction must have rendered the prior judgment; (3) the prior judgment must have been final and on the merits; and (4) the plaintiff must raise the same cause of action in both suits." *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 313 (5th Cir. 2004). In the Fifth Circuit, *res judicata*, or claim preclusion, "forecloses relitigation of claims

12

that were or could have been advanced in support of the cause of action on the occasion of the former adjudication." *Id.* at 312-13 (5th Cir. 2004) (citing *Allen*, 449 U.S. at 94). The parties agree that the first three elements are met in this case. Therefore, the Court must determine whether the same cause of action is involved in the two suits, such that Oreck could have brought its false advertising claim concerning the DC18 in the earlier action.

To determine whether the two suits involve the same cause of action, the Court applies the "transactional test" stated in the Restatement (Second) of Judgments, § 24. *Petro-Hunt, L.L.C. v. United States*, 365 F.3d 385, 395 (5th Cir. 2004). Under this approach, the Court asks "whether the two actions are based on the same 'nucleus of operative facts.'" *Davis*, 383 F.3d at 313 (citations omitted). It is the "nucleus of operative facts" in the first action, rather than the "facts litigated" or the "type of relief requested, substantive theories advanced, or types of rights asserted, [that] defines the claim." *United States v. Davenport*, 484 F.3d 321, 326, 327 (5th Cir. 2007) (citation omitted). The determination is a practical weighing of various factors, including "whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties'

13

expectations or business understanding or usage." *Davis*, 383 F.3d at 313 (citations omitted). Furthermore, "[i]f the cases are based on the same nucleus of operative facts, the first judgment's preclusive effect "extends to all rights the original plaintiff had 'with respect to all or any part of the transaction, or series of connected transactions, out of which the [original] action arose.'" *Davenport*, 484 F.3d at 326 (quoting *Petro-Hunt,* 365 F.3d at 395.)

## III. DISCUSSION

### A.    Elements of a False Advertising Claim

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), prohibits the use of false designations of origin, false descriptions, and false representations in the advertising and sales of goods and services in interstate commerce. The statute provides, in relevant part:

> Any person who, on or in connection with any goods . . . uses in commerce any false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

28 U.S.C. § 1125(a)(1)(B). To make a *prima facie* case of false advertising under § 43(a), a plaintiff must establish:

14

(1)   A false or misleading statement of fact about a product;
(2)   Such statement either deceived, or had the capacity to deceive a substantial segment of potential consumers;
(3)   The deception is material, in that it is likely to influence the consumer's purchasing decision;
(4)   The product is in interstate commerce; and
(5)   The plaintiff has been or likely to be injured as a result of the statement at issue.

*Pizza-Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 495 (5th Cir. 2000) (citing *Taquino v. Teledyne Monarch Rubber*, 893 F.2d 1488, 1500 (5th Cir. 1990)).

The Lanham Act does not define the terms "commercial advertising or promotion," but the Fifth Circuit has explained that these terms should be given their "plain and ordinary meanings." *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1384 (5th Cir. 1996) (citing cases). In addition, the Lanham Act is a "remedial statute that should be broadly construed." *Id.* at 1383 (citing *Gordon & Breach Science Publishers v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1532 (S.D.N.Y. 1994)). In order for representations to constitute commercial advertising or promotion within the meaning of § 43(a) of the Lanham Act, four criteria must be satisfied. The representations must be (1) commercial speech; (2) made by a defendant that is in commercial competition with the plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services; and (4) disseminated sufficiently to the relevant purchasing public to constitute

15

"advertising" or "promotion" within that industry. *Id.* at 1384.

Neither party disputes that the documents touting the DC18 as the "most powerful lightweight" that "does not lose suction" constitute commercial speech or that Oreck and Dyson are competitors in the vacuum cleaner industry. Instead, they dispute whether Dyson's marketing of the DC18 to retailers during the pendency of the first action, without advertising or sales to ultimate consumers, gave rise to a Lanham Act false advertising claim that was part of the same cause of action as the first suit.

**B.    Same Cause of Action**

The Court finds that Oreck's specific claims with respect to the DC18 are part of the same cause of action that it brought in the first lawsuit. Under the transactional test, "[w]hen a defendant is accused of . . . acts which though occurring over a period of time were substantially of the same sort and similarly motivated, fairness to the defendant as well as the public convenience may require that they be dealt with in the same action." Restatement (Second) of Judgments § 24, cmt. d. In addition, ignorance of a potential claim, when there is no showing that the facts giving rise to that claim were undiscoverable or somehow concealed from the plaintiff, is insufficient to halt the preclusive effect of the doctrine of *res*

16

*judicata*. *See In re Howe*, 913 F.2d 1138, 1147 (5th Cir. 1990).
*See also Manego v. Orleans Board of Trade*, 773 F.2d 1, 6-7 (1st
Cir. 1985); *Harnett v. Billman*, 800 F.2d 1308, 1313 (4th Cir.
1986) (explaining that "actual knowledge of a potential claim is
not a requirement for application of" the doctrine of *res
judicata* because "it is not necessary to ask if the plaintiff
knew of his present claim at the time of the prior judgment, for
it is the existence of the present claim, not party awareness of
it, that controls"). The Restatement (Second) of Judgments, § 26,
comment j, recognizes an exception to the general rule of *res
judicata* in cases of fraud or misrepresentation by the defendant:

> A defendant cannot justly object to being sued on a part or
> phase of a claim that the plaintiff failed to include in an
> earlier action because of the defendant's own fraud. . . .
> The result is the same when the defendant was not
> fraudulent, but by an innocent misrepresentation prevented
> the plaintiff from including the entire claim in the
> original action.

Restatement (Second) of Judgments, § 26, cmt. j. The Restatement
acknowledges, however, that the exception does not apply when
"the failure of the plaintiff to include the entire claim in the
original action was due to a mistake, not caused by the
defendant's fraud or innocent misrepresentation." *Id.*

Here, it can be fairly said that Dyson's marketing
representations to retailers about the DC18 were substantially of
the same sort and similarly motivated as the claims that it made

17

about other vacuum cleaner models. Dyson generally advertised
that its products do not lose suction during the course of normal
operation. It made similar claims about the DC18 in its marketing
campaign to retailers during the period before Oreck settled its
claims in the first action. Oreck acknowledges that in response
to discovery requests, Dyson produced documents that referred to
testing trials and planned marketing strategies for the DC18.[27]
Oreck attempts to downplay the significance of these documents on
the grounds that they refer to the "N70," the model number that
Dyson used for the DC18 while it was in its developmental and
testing stages, and because they were a part of thousands of
pages of documents produced during the course of discovery.
Although Oreck had information about DC18/N70, it never requested
any additional discovery about the model or Dyson's marketing of
it. Further, Oreck cites no authority for the proposition that a
large volume of discovery somehow absolves it of its duty to
examine what was produced. Oreck does not argue, and the facts do
not suggest, that Dyson somehow concealed information about the
DC18 such that Oreck could not have known of its existence or
Dyson's advertising and promotion efforts.

Oreck sued on Dyson's broad advertising claims that its
vacuum cleaners do not lose suction. Oreck did not limit its

---

[27] *See* Pl.'s Opp. Mem. at 10; Def.'s Exs. E: B-L.

complaint to specific models. Dyson's promotion of the DC18 strongly resembles its advertising of other models, in that it claimed that the DC18 does not lose suction and does not clog. Whether or not Oreck had actual knowledge of the DC18, the documents that Dyson produced in response to Oreck's discovery requests indicate that information about the DC18 was reasonably discoverable had Oreck acted diligently. On October 31, 2006, Dyson produced numerous documents that referred to the N70.[28] At that point, Dyson had already begun promoting that vacuum cleaner to retailers using the same no loss of suction claims at issue in the first suit.

There is no indication that Oreck could not have attacked Dyson's claims about the DC18 before the Court entered final judgment. Oreck did so with respect to other Dyson models, including the DC15, which Oreck added to the group of vacuums about which it had concerns during the course of discovery. This case does not present a situation in which plaintiff's claims are based on conduct transpiring only after the earlier litigation had concluded. *See Kilgoar v. Colbert County Bd. of Educ.*, 578 F.2d 1033 (5th Cir. 1978) (holding that plaintiff's claims based on actions occurring after earlier litigation are not precluded by *res judicata* even though earlier litigation attacked same kind

---

[28] *See* Dyson's Mem. Supp. Ex. E, Steinberg Decl. at 2-5.

of conduct). Instead, Dyson's promotion of the DC18 with the advertising claims at issue in the second suit began to occur at least two and a half months before the parties settled the first litigation.

Oreck argues that Dyson's promotion of the DC18 was not the subject of the first suit because Dyson did not begin promoting that vacuum until well after Oreck instituted the first lawsuit. But in the first action, Oreck broadly challenged Dyson's claims that its vacuum cleaners do not lose suction. Dyson made this very claim about the DC18 in its promotions to retailers in the fall of 2006. Dyson's promotion of the DC18 was part of the same advertising campaign about which Oreck complained in the first suit. In addition, Oreck has made clear that the first lawsuit did not apply to only those Dyson vacuum cleaners being promoted and advertised as of February 10, 2005, the date on which it filed the first lawsuit. Oreck admits that "[a]t some point during the course of the Prior Action, Dyson began offering for sale in the United States its DC-15 vacuum," and that Oreck then sought discovery on the DC15 and treated it as one of the vacuums subject to its false advertising claims.[29] Oreck cannot have it both ways, settling claims for some vacuum cleaner models of which it became aware during discovery but not others. With

---

[29] *See* Bruce J. Oreck Decl., July 10, 2007 at ¶¶ 4-5.

diligence, Oreck could have amended its complaint to specify that the DC18 and the other Dyson vacuums that allegedly do not lose suction were subjects of the suit. *See Langston v. Ins. Co. of N. Am.*, 827 F.2d 1044, 1048-49 (5th Cir. 1987). But it did not. Indeed, Oreck's complaint never mentioned any of the particular vacuum cleaner models about which it complained and instead attacked Dyson's no loss of suction claims generally. The Court finds that Dyson's promotional claims about the DC18 were part of the same series of advertisements that formed the basis of the first action. Thus, Oreck's claims about the DC18 in the second suit are part of the same cause of action that it brought in the first suit.

### C.   Actionability of Dyson's Advertising Claims about the DC18 to Retailers

Oreck also argues that it could not have brought its claims regarding Dyson's promotion of the DC18 during the first action because Dyson had not yet begun advertising and selling the DC18 to individual consumers. The Court finds no merit in this argument. No restriction limits a plaintiff's potential false advertising claims to claims involving advertising to ultimate consumers. Additionally, Dyson's promotions to retailers — some of which also sold Oreck vacuums — resulted in actual sales of the DC18.

21

Oreck could have satisfied the requirements for obtaining relief on a false advertising claim under § 43(a) of the Lanham Act with respect to the DC18. To obtain an injunction or monetary damages — remedies that Oreck sought in the first action and seeks again in the second — "a plaintiff must demonstrate that the commercial advertisement or promotion is either literally false, or that [if the advertisement is not literally false,] it is likely to mislead and confuse consumers." *Pizza-Hut*, 227 F.3d at 495 (citing *Seven-Up*, 86 F.3d at 1390) (alteration in original). *See also Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 153 (2d Cir. 2007) (explaining that a plaintiff may recover on a false advertising claim by showing either that the challenged claim is "literally false, *i.e.*, false on its face" or that it is likely to mislead or confuse consumers). And a showing that an advertisement is literally false, is sufficient by itself to obtain relief. *See Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002) ("[O]nce a court deems an advertisement to be literally false, the movant need not present evidence of consumer deception."); *Cashmere & Camel Hair Mfrs. Institute v. Saks Fifth Ave.*, 284 F.3d 302, 311 (1st Cir. 2002) ("Where the advertisement is literally false, a violation may be established without evidence of consumer deception."); *United Indus. Corp. v. Clorox Corp.*, 140 F.3d 1175,

1180 (8th Cir. 1998) (explaining that if a plaintiff "proves that a challenged claim is literally false, a court may grant relief without considering whether the buying public was actually misled; actual consumer confusion need not be proved"). Further, a plaintiff need show only that there is a reasonable likelihood that it will suffer injury as a result of the complained-of advertising in order to assert a false advertising claim. *See B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 258 F.3d 578, 581 (7th Cir. 2001) (citing cases); *Warner-Lambert Co. v. Breathasure, Inc.*, 204 F.3d 87, 97 (3d Cir. 2000).

As an initial matter, a company's marketing materials given to distributors or retailers but not to ultimate, individual consumers are considered advertisements or promotions within the meaning of the Lanham Act. Courts that have considered the issue of whether documents or presentations given to intermediate purchasers that later sell a defendant's products to end-consumers constitute advertisements or promotions have explained that "nothing in the language of § 43(a) specifically requires a false representation be intended 'to influence the *ultimate consumer*, whoever that might be.'" *Seven-Up*, 86 F.3d at 1385 (quoting *American Needle & Novelty, Inc. v. Drew Pearson Marketing, Inc.*, 820 F. Supp. 1077, 1077-78 (N.D. Ill. 1993)) (emphasis in original). *See also Porous Media Corp. v. Pall*

23

*Corp.*, 173 F.3d 1109, 1121 (8th Cir. 1999) (finding statements made to intermediate purchasers and vendors actionable); *Symantec Corp. v. CD Micro, Inc.*, No. Civ. 02-406-KI, 2003 WL 23539587, at *3 (D. Or. Feb. 3, 2003) (rejecting argument that statements made to intermediate parties were not actionable under § 43(a) because what is important for determining whether a party has a false advertising claim is whether the alleged misrepresentation was "made to an entity who purchases plaintiff's product, not whether that entity is the ultimate consumer"); *Republic Tobacco, L.P. v. North Atlantic Trading Co.*, No. 98 C 4011, 1999 WL 261712, at *7 (N.D. Ill. Apr. 9, 1999) (explaining that in an industry where producers rely on distributors and retailers to sell their products to individual consumers, "where the potential purchasers in the market are relatively limited in number, a single promotional presentation may be enough to trigger the protection of section 1125(a)"); *Williams Electronics, Inc. v. Bally Mfg. Corp.*, 568 F. Supp. 1274, 1283 n.24 (N.D. Ill. 1983) (reasoning that information disseminated to a distributor but not to the ultimate consumer was covered under § 43(a) because that information was given to entities who, in turn, would use it to influence purchasing decision of ultimate consumers); *Matsushita Electric Corp. of American v. Solar Sound Systems, Inc.*, 381 F. Supp. 64, 69 (S.D.N.Y. 1974) (treating statements made in

solicitations for sales to electronics distributors at a trade show as actionable because to do otherwise would "leave the federal government powerless to prevent fraudulent interstate advertising"); *N.S. Meyer, Inc. v. Ira Green, Inc.*, 326 F. Supp. 338, 343-44 (S.D.N.Y. 1971) (explaining that representations in catalogs that retail clerks used to fill orders from military personnel constituted advertisements or promotion within the meaning of § 43(a) even though individual consumers did not utilize the materials because the orders were "for the benefit of the individual consumers").

The determination of whether a party has promoted or advertised a competing product to the relevant purchasing public depends on the nature of the specific industry. *See Seven-Up*, 86 F.3d at 1385. In *Seven-Up*, the Seven-Up company brought a false advertising claim against the Coca-Cola company for claims that Coca-Cola made to independent bottlers and distributors in private presentations and negotiations as part of an effort to convince those bottlers and distributors to switch from Seven-Up to Coca-Cola products. Both Seven-Up and Coca-Cola distributed their products through independent bottling companies. *Id.* at 1381. Coca-Cola argued that Seven-Up failed to state a claim under the Lanham Act because it had not sufficiently disseminated its claims about the market to the public to constitute

advertising under the Lanham Act. *Id.* at 1384. The Court rejected that argument, emphasizing that Coca-Cola's claims were not isolated statements and that at the time Coca-Cola made these statements, the independent bottlers in Coca-Cola's audience "were the only relevant potential 'consumers' or 'purchasing public' for this intermediate product." *Id.* at 1386.

Dyson's promotion of the DC18 to retailers in the fall of 2006 is analogous to Coca-Cola's presentations to independent bottlers in *Seven-Up*. The participation of retailers is integral to the sale of Dyson's vacuum cleaners. Its marketing to individual consumers depends on retail stores' carrying its products. To place its vacuum cleaners in retail stores, it must make sales to these stores. Thus, similar to the soft-drink distributors in *Seven-Up*, retail stores to which Dyson promotes its vacuums are part of the relevant purchasing public. *See id.* at 1387. Moreover, at the initial product-launch stage before the DC18 became available for sale to individual consumers, the retail stores were the only relevant purchasing public for the DC18.

Although Oreck contends that it does not compete with Dyson for retail shelf space, the record undermines that argument. Testimony of Oreck's own employees confirms that its vacuums are sold in some of the same stores that carry Dyson's vacuums.

26

Steven Hanson, a Dyson employee, testified in a deposition in the first case that Oreck had products in Bed Bath & Beyond and also sold vacuums through JC Penney and other retailers' catalogs.[30] Oreck's General Counsel, Bruce Oreck, declares that "Oreck does not sell its vacuum cleaner products to 'big box' retailers such as a Sears, Wal-Mart, and Target."[31] But he does not contradict the sworn testimony of Hanson or deny that Oreck sells products through JC Penney, Bed Bath & Beyond, or other retailers.

Oreck argues that it could not have brought a false advertising claim with respect to Dyson's DC18 promotions to retailers because it had no way of testing the veracity of Dyson's claims that the DC18 does not loss suction and is the most powerful lightweight vacuum cleaner. The record before the Court shows that Oreck is incorrect in this regard. As discussed, *supra*, Dyson produced documents concerning its plans to promote its lightweight vacuum cleaner. It actively used the disputed advertising claims to promote the DC18 to retailers beginning in October 2006. There were hundreds of units of the DC18 in the United States before the parties settled the first litigation. As Dyson correctly points out, Oreck could have requested production

---

[30] *See* Dyson's Mem. Supp. Ex. C-C, Dep. Steven W. Hanson Dec. 13, 2006 at 23-24. And as noted, *supra*, Oreck continues to sell vacuums through JC Penney.

[31] *See* Decl. of Bruce J. Oreck, July 10, 2007 at ¶ 18.

27

of the DC18 under Federal Rule of Civil Procedure 34(a). This case does not present a scenario like that in *Alphamed Pharmaceuticals Corp. v. Arriva Pharmaceuticals, Inc.*, 391 F. Supp. 2d 1148 (S.D. Fla. 2005), in which the court concluded that the plaintiff lacked standing to assert a false advertising claim against a competitor biopharmaceutical company because neither the plaintiff nor the defendant actually had products on the market that were either harmed by or the subject of defendant's allegedly false claims. *See id.* at 1163-65. Here, Oreck had products in the market that could have been harmed by false advertising of the DC18, and Oreck could have obtained discovery on the DC18 had it so requested. The DC18 was not merely a concept during the pendency of the first action.

Oreck asserts that it lacked standing to attack the DC18 advertising claims in the first suit because its injury would have been too speculative. *See Logan v. Burgers Ozark Country Cured Hams, Inc.*, 263 F.3d 447, 460 (5th Cir. 2001) (explaining that courts must consider "the speculativeness of the damages claim" among other factors in determining whether a plaintiff has prudential standing to bring a false advertising claim under the Lanham Act). But if Oreck is likely to suffer injury as a result of Dyson's advertising to individual consumers as it now claims, then Oreck would also be reasonably likely to suffer injury as a

28

result of Dyson's promotion to retailers. Both Oreck and Dyson utilize retailers to sell their vacuum cleaners. Indeed, as discussed, *supra*, they sell their products in some of the same stores. In addition, Dyson relies on sales to retailers to create a platform from which it can reach the individual consuming public. Unless Dyson can place its products on retailers' shelves, it cannot market them to individuals. Further, because Oreck, a direct competitor of Dyson's, alleges that the no loss of suction claim is literally false, it would not have had to prove that buyers were actually deceived by the ads. When an advertisement is shown to be literally false, "consumer deception is presumed, and 'the court may grant relief without reference to the advertisement's [actual] impact on the buying public.'" *Time Warner Cable*, 227 F.3d at 153 (quoting *Coca-Cola Co. v. Tropicana Prods., Inc.*, 690 F.2d 312, 317 (2d Cir. 1982)).

Also, to have obtained injunctive relief on a claim of literal falsity, Oreck would not have had to show injuries in the way of actual lost profits or diverted sales. *See Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1145 (9th Cir. 1997) (citing *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 210 (9th Cir. 1989)). The threat of likely injury is enough. *See B. Sanfield*, 258 F.3d at 581. And although Dyson had sold thousands of units of the DC18 to retailers during the pendency

of the first action, Oreck would not have needed to show that Dyson made actual sales using allegedly false advertisements. The Lanham Act does not require actual sales of goods for a cause of action for false advertising to accrue, and courts have recognized that the mere solicitation of sales with false advertisements is sufficient to place goods into interstate commerce and thus expose a defendant to liability for false advertising under the Lanham Act. *See Hix Corp. v. Nat'l Screen Printing Equip., Inc.*, 108 F. Supp. 2d. 1204, 1208 (D. Kan. 2000) (citing *Shatel Corp. v. Mao Ta Lumber & Yacht Corp.*, 697 F.2d 1352, 1356 (11th Cir. 1983); *Walt Disney Prods. v. Filmation Assocs.*, 628 F. Supp. 871, 879 n.7 (C.D. Cal. 1986) (citing cases). Even if Oreck could not yet have identified actual discrete financial injuries traceable to Dyson's advertisements, its false advertising claim would have been "viable to the extent it sought an injunction." *Southland Sod Farms*, 108 F.3d at 1145-46. Therefore, inasmuch as Oreck contends that Dyson's claims are literally false, it could have asserted those claims before final judgment in the first action and, at a minimum, obtained injunctive relief. Such relief would have prevented the irreparable harm that Oreck claims to be suffering in the second suit.

The Fifth Circuit explained in *Logan* that Congress intended

to curb literally false advertising through the Lanham Act. *See Logan*, 263 F.3d at 461. In *Logan*, the court did not articulate a cabined view of standing under the Lanham Act, inasmuch as it recognized standing in a party who was not a direct competitor of the defendant's. *Id*. Rather, the court looked to whether the plaintiff suffered the type of injury that Congress sought to redress under the Lanham Act, the directness of the injury, and the proximity of the parties. To the extent that the Court focused on the speculativeness of the injury, it inquired into whether the plaintiff's alleged injury was fairly traceable to the type of conduct prohibited by the Lanham Act and not whether the amount of damages was as yet uncertain. In *Logan*, the question was whether the plaintiff was the proper party to bring suit, not whether plaintiff's claim was ripe. There, the defendant's advertising methods injured that plaintiff because they likely influenced customers to purchase one product over another. So too, were Dyson's claims about the DC18 likely to influence purchasing decisions. The *Logan* court concluded that a patent holder's injury was such as to be cognizable under the Lanham Act. Clearly, then, a direct competitor has standing to challenge false advertisements that threaten it with injury. Any representations that Dyson makes to retailers about its products constitute advertisements or promotion that, if false, would

31

likely threaten injury to Oreck because Oreck is a direct competitor. If Dyson's false claims help to place its products in the market, then they would likely threaten lost profits to Oreck not only on its sales to retailers, but also on sales to ultimate consumers because the false statements help make it possible to reach individual consumers through retailers. *See Republic Tobacco*, 1999 WL 261712, at *7. A plaintiff "need not demonstrate that it has, in fact, 'lost sales because of the defendant's advertisements,'" to establish that it has suffered injury for standing purposes, so long as a reasonable basis exists for the belief that an advertising claim will cause the plaintiff injury. *ITC, Ltd. v. Punchigini, Inc.*, 482 F.3d 135, 172 (2d Cir. 2007) (quoting *Ortho Pharm.*, 32 F.3d at 694. *See also Coca-Cola Co. v. Tropicana Prods., Inc.*, 690 F.2d 312, 317 (2d Cir. 1982). Such a threatened injury would have been redressable in the first suit by the same type of injunctive relief that Oreck now seeks in this suit.

In short, all the elements of a false advertising claim with respect to Dyson's retail promotion of the DC18 existed during the pendency of the first action. Oreck alleges that Dyson makes literally false claims about a product destined for a group of consumers for whose dollars Oreck competes that is likely to cause it injury. In the fall of 2006 before final judgment in the

first case, Dyson made the same claims to a group of consumers for whose shelf space Oreck also competes. Such claims, if literally false, threatened Oreck with injury similar to that resulting from claims made to individual consumers. Given the nature of sales in the vacuum cleaner industry, the remedial nature of the Lanham Act, and the caselaw interpreting the potentially injurious effects of representations made to intermediate distributors, Oreck could have advanced in the first lawsuit a false advertising claim for Dyson's marketing representations about the DC18 to retailers. Therefore, the doctrine of *res judicata* precludes it from brining the claims contained in the second suit.

## IV.  CONCLUSION

For the foregoing reasons, the Court GRANTS defendant's motion and dismisses plaintiff's complaint with prejudice.

New Orleans, Louisiana, this 22nd day of February 2008

_____

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE

33